IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

MARGARET SHAW HENDERSON,    )
                            )
        Plaintiff,          )
                            )
v.                          )        CASE NO. 2:05-CV-00064-WKW
                            )        (wo)
                            )
CHRIS INABINETT, et al.     )
                            )
        Defendants.         )

## MEMORANDUM OPINION AND ORDER

_____This case is before the Court on the defendants' Motion for Summary Judgment (Doc. # 66) and on the plaintiff's First Motion in Limine (Doc. # 76).  For the reasons set forth below, the motion for summary judgment is due to be granted and the motion in limine will be denied as moot.

### I.  FACTS AND PROCEDURAL HISTORY

This case arises out of the October 28, 2004 shooting death of Aaron Shaw during his arrest. Plaintiff Margaret Shaw Henderson ("Plaintiff"), as administratrix of the estate of Aaron Shaw, filed this action against Deputy Chris Inabinett ("Deputy Inabinett") and Captain Walter Inabinett ("Captain Inabinett"), alleging § 1983 claims for the use of excessive and deadly force in violation of the Fourth and Fourteenth Amendments and state law claims for assault and battery.  Defendants filed a motion for summary judgment, which is opposed by Plaintiff.  Plaintiff submitted the following as uncontested facts:

> The following facts are clear and undisputed; (1) Aaron Shaw was handcuffed at the time of the shooting, (2) Aaron Shaw was further restrained by a leg restraint device, (3) Aaron Shaw was on the ground in a prone or semi-prone position when he was shot, (4) Aaron Shaw was shot twice in the back, (5) There were three police officers present when Aaron Shaw was shot.

(Pl. Resp. Br. 6.)  At first blush, these uncontested facts are disturbing; however, upon a very careful consideration of the briefs and evidentiary submissions of the parties, the Court must conclude that the facts of this case are much more complicated than those proposed by Plaintiff.  The Court reiterates all of the relevant facts as contained in the parties' evidentiary submissions.  The facts are largely undisputed.  Where a fact is in dispute, it is portrayed in the light most favorable to Plaintiff.

Deputy Inabinett, who is a deputy in the Covington County Sheriff's Department, was working part-time for the Florala Police Department.  On the morning of October 28, 2004, he was on duty as a Florala officer when a complaint was made against Mr. Shaw.  A warrant for Mr. Shaw's arrest for Third Degree Criminal Trespass was issued by Florala Municipal Court Magistrate Jenell Hill.  Later that morning, Deputy Inabinett was dispatched to Martin Luther King Street where Mr. Shaw was reportedly trespassing again.

Deputy Inabinett located Mr. Shaw on Martin Luther King Street at 11:36 a.m., and the men greeted each other.  Incident to arrest and because of Mr. Shaw's propensity to carry knives, Deputy Inabinett patted him down.  He recovered a knife from Mr. Shaw's back pocket.  When Deputy Inabinett opened the patrol car's back door for Mr. Shaw and told Mr. Shaw he was under arrest on a warrant, Shaw's demeanor changed.  He backed away and demanded to see the warrant.  The parties have stipulated that Mr. Shaw had been drinking alcohol and using cocaine that morning.

Deputy Inabinett attempted to handcuff Mr. Shaw and, when Mr. Shaw resisted, attempted to use force to effect the arrest.  The force used escalated proportionately with Mr. Shaw's resistance. In chronological order, Deputy Inabinett used Freeze +P chemical spray, kicked Mr. Shaw in his thigh, groin, and shin, and pushed him against the car, yet these tactics had no effect on Mr. Shaw. Mr. Shaw struggled continually, attempted to grab Deputy Inabinett's pistol, broke free and ran

2

away.  Deputy Inabinett radioed for backup at 11:38 a.m. before pursuing Mr. Shaw on foot.  When he caught up with Mr. Shaw, he ordered him to the ground and attempted to force him to the ground when Mr. Shaw failed to comply.  Deputy Inabinett tackled Shaw and attempted to hold him down with his body weight; however, Mr. Shaw stood straight up with Deputy Inabinett on his back.  The struggle ensued.  Mr. Shaw grabbed for Deputy Inabinett's pistol and groin. Deputy Inabinett asked a bystander, John Robert Caldwell, for his help.  The two men attempted to handcuff Mr. Shaw.  With repeated punches to Mr. Shaw's locked arm, Deputy Inabinett was able to secure the handcuffs but only in front of Mr. Shaw's body.

Deputy Inabinett then ordered Mr. Shaw to stand up and walk to the patrol car approximately one block away.  Shaw refused to move but then struggled when Deputy Inabinett attempted to drag him by his legs.  Deputy Inabinett radioed a report to dispatch at 11:42 a.m.  Deputy Inabinett fell and Mr. Shaw came at him, but Deputy Inabinett grabbed Mr. Shaw's groin and pushed him away.  At this point Mr. Shaw stood up and began to walk toward the road.  Off-duty Florala police officer Perry Williams ("Officer Williams") arrived at the scene at 11:43 a.m., and Mr. Shaw started fighting again.  Deputy Inabinett and Officer Williams wrestled with Mr. Shaw but could not get him inside Officer Williams' patrol car.  Off-duty Florala police officer Marvin Williford ("Officer Williford") also arrived at 11:43 a.m.  The three officers had a difficult time putting Mr. Shaw in the patrol car.  Several defense witnesses testified that Mr. Shaw was resisting their efforts to put him in the car.  Deputy Inabinett reports that he used several techniques to get Mr. Shaw to comply, including applying pressure to the mandibular angle, kicking the common peroneal, and using what he calls defensive counterstrikes.  The three officers got Mr. Shaw into the car, and Officer Williford radioed a report at 11:46 a.m.

3

When Mr. Shaw was secured in the back of Officer Williams' patrol car, Deputy Inabinett began his transport to the Covington County Jail in Andalusia, the jail used by the City of Florala to house its prisoners, at 11:48 a.m. Mr. Shaw began to kick at the driver's side back door window. Several individuals witnessed the kicking. At 11:49 a.m., just .2 miles away from Martin Luther King Street, at the intersection of DeWight Stone Avenue and Sixth Street, Deputy Inabinett radioed for assistance. Officer Williford, joined by Officer Williams, brought leg irons to Deputy Inabinett. When the officers attempted to apply the leg irons, Shaw grabbed a traffic RADAR antenna off the rear deck and struck Deputy Inabinett's head with it. Deputy Inabinett punched Mr. Shaw in the face, and after Mr. Shaw attempted to hit him again with the antenna, Deputy Inabinett punched Mr. Shaw in the face again. Officer Williams wrestled the antenna away from Mr. Shaw. Because Mr. Shaw could still kick while wearing the leg irons, which restricted only the length of Mr. Shaw's stride, Officer Williford radioed a request for a county patrol car with bars on the windows. Covington County Deputy Teddie Rae Motley ("Deputy Motley") was dispatched at 11:52 a.m., but he reported that he was fifteen minutes away. Because Deputy Inabinett's Covington County Sheriff's Office patrol car was parked at his house in Florala, which was much closer, he obtained permission to call off duty with Florala, call on duty with Covington County Sheriff's Office, and use his county patrol car, which had bars on the windows and also contained his TASER, to complete the transport. After retrieving his county patrol car, he called off duty with Florala and on duty with Covington County at 11:59 a.m.

When he returned to Officer Williams' car, where Officers Williams and Williford had restrained Mr. Shaw, Deputy Inabinett ordered Mr. Shaw into the county patrol car. He refused and started kicking when the officers tried to grab him. Deputy Inabinett warned Mr. Shaw that he would

use his TASER to shock him if he did not get out of the car.  Mr. Shaw refused.  Deputy Inabinett

applied the TASER to Mr. Shaw's leg.[1]  The TASER is programmed by the manufacturer to deliver

only a five-second shock with each activation.  The TASER's internal log registered the time as

12:01:52 p.m.  The officers were able to remove Mr. Shaw from Officer Williams' car, but Mr. Shaw

refused to get into the county patrol car and continued struggling.  Deputy Inabinett applied the

TASER to Mr. Shaw's leg again at 12:03:07 p.m., at which time Officer Williford pulled Mr. Shaw

into the car.  Deputy Inabinett avers that at some point during the struggle Mr. Shaw tried to grab the

TASER from him.

The defendants vividly describe the struggle during this time, stating that Mr. Shaw flailed

his arms and legs wildly and alternated between kicking the officers and locking his body in rigid

posture.  Deputy Inabinett admits that he gave several verbal commands and used counterstrikes to

block the Mr. Shaw's kicks and hits.  Plaintiff specifically offers evidence that Deputy Inabinett

repeatedly kicked (Everett Wallace Dep. 36:11-38:2) and choked and struck  (Linda Carson Dep.

28:17-29:14) Mr. Shaw while he was in the back of the patrol car.[2]

---

[1]  According to the defendants, a TASER can be used in two ways.  The first method involves firing metal barbs into the suspect from a range of up to twenty-one feet.  The barbs are fired from a compressed nitrogen cartridge.  The barbs are attached to the TASER by thin wires through which an electrical current flows.  The second method, the drive stun mode, involves the application of the TASER directly to the suspect's body after removing the cartridge.  The defendants contend, and the plaintiff does not dispute, that the TASER was used only in the drive stun mode during this incident.

[2]  Plaintiff not only miscited but also somewhat mischaracterized the deposition testimony of the eyewitnesses.  First, defense counsel asked Mr. Wallace: "But that's what you saw is Chris had his foot inside the car and he was – you can call it kicking or you can call it pushing, but he was making a movement with his foot toward the inside of the car?"  Mr. Wallace answered, "Yes, sir."  (Wallace Dep. 37:19 - 38:2.)  Mr. Wallace's testimony does not support the statement that the deputy was "repeatedly kicking" Mr. Shaw in the back of the patrol car.  Second, Ms. Carson testified that "But I seen him [Inabinett] grab him [Shaw] around his neck and hold him, try to force him down to the ground.  I don't know if you call it a head lock, but the way I seen him, it looked like he was trying to choke him to force him down to the ground."  (Carson Dep. 29:9-14.)  According to Ms. Carson, this occurred as Mr. Shaw was fleeing from Deputy Inabinett and not in the back of the patrol car.  The entirety of the deposition testimony of these witnesses does not contradict the facts submitted by the defendants.

With Mr. Shaw in the back of the county patrol car, Deputy Inabinett resumed his transport to the Covington County jail at 12:05 p.m. The radio log reflects that Deputy Inabinett believed that Mr. Shaw was under the influence of drugs. (Kristi Stamnes Aff. Exs.) Deputy Inabinett also asked Deputy Motley to follow in case he needed to stop due to Mr. Shaw's kicking. (*Id*., Chris Inabinett Aff. ¶ 103.) Deputy Inabinett states that Mr. Shaw jumped around the back seat, yelled that snakes were getting him, kicked the Plexiglas partition separating the front and back seats and yelled, "I'm coming." (Stamnes Aff. Exs., C. Inabinett Aff. ¶¶ 105-106.) He testified that he was concerned that if the partition were to be kicked out, Mr. Shaw would have access to four firearms and the TASER that were in the front seat or he would cause an accident. (C. Inabinett Aff. ¶ 106.) Deputy Inabinett pulled off of Highway 55 into a grassy area in front of an electrical substation.[3] Deputy Motley also pulled over. He saw Mr. Shaw kicking inside Deputy Inabinett's county patrol car. Deputy Motley opened the passenger-side rear door, and Mr. Shaw tried to come out. Deputy Motley sprayed Mr. Shaw's face with the chemical spray, but Mr. Shaw kept coming. The deputies struggled with Mr. Shaw, and Deputy Inabinett applied the TASER to Mr. Shaw. Mr. Shaw took the TASER from Deputy Inabinett.

Deputy Inabinett alleges to have been fearful that Mr. Shaw would incapacitate him with the TASER and take his pistol. While the deputies struggled for control of the TASER, Captain Inabinett, aware of the ongoing struggle to arrest Mr. Shaw from radio transmissions, arrived on the scene.[4] He saw the deputies fighting with Mr. Shaw as Mr. Shaw tried to come out of the patrol car.

---

[3] Deputy Inabinett recalled that Deputy Motley radioed to him to pull over so they could spray Mr. Shaw. Plaintiff shows that the radio logs do not reflect such a transmission and that Deputy Motley denied that he had radio contact with Deputy Inabinett immediately before they exited the roadway.

[4] Captain Inabinett first learned of Deputy Inabinett's struggle to arrest Mr. Shaw from his daughter, an employee of the City of Lockhart. Captain Inabinett contacted the Sheriff to advise that he would respond to Florala

(Walter Inabinett Dep. 39.)  When he got out of his truck, Captain Inabinett heard the "zapping" of the TASER. (*Id*.)  At about this time, Deputy Inabinett told Deputy Motley to move because he was going to shoot Mr. Shaw.  In his last attempt to get the TASER back by shoving Mr. Shaw, Deputy Inabinett was shocked in the arm with the TASER and fell to the ground.[5]

Deputy Motley continued to struggle with Mr. Shaw over the TASER.  He felt like he was starting to get a shock but admitted that the TASER was not applied directly to his body.  Captain Inabinett heard the TASER gun zapping and believed that Deputy Motley or somebody "was hollering – screaming to the top of their voice." (*Id*. at 42.)  Because his concern for Deputy Motley's "safety," in light of the facts that Deputy Inabinett "was down" and the TASER gun was zapping, Captain Inabinett ordered Deputy Motley to let go of Mr. Shaw.[6]  Deputy Motley pushed away from Mr. Shaw of his own volition and fell to the ground.  When Deputy Motley moved away, Mr. Shaw came out of the car with the TASER in a firing position and fell to his knees.  Deputy Motley stated that Mr. Shaw began to move toward him with outstretched hands.  Captain Inabinett stated that Mr. Shaw began to rise with the TASER in his hand.[7]  Then, Captain Inabinett, who was standing a few

because he "had dealt with Aaron before."  (Pl. Resp. Br. 8.)  At some point during the arrest of Mr. Shaw, Deputy Inabinett contacted Captain Inabinett via Linc, at which time he communicated to Captain Inabinett that Mr. Shaw had tried to get Deputy Inabinett's firearm.  Captain Inabinett was also in regular radio contact with Deputy Motley.

[5] Plaintiff demonstrates that the officers's various statements are not in agreement as to the exact location where Deputy Inabinett fell and in what direction he moved after he fell on the ground.

[6] Captain Inabinett stated that he may have pulled or pushed Deputy Motley out of the way.

[7] Plaintiff asserts that, in Captain Inabinett's statement to the Alabama Bureau of Investigation ("ABI"), he stated that Mr. Shaw moved away from the patrol car and toward Deputy Motley with the TASER.  Plaintiff further asserts that Captain Inabinett changed the story in his deposition testimony, wherein he stated Mr. Shaw moved away from the patrol car toward Deputy Motley, then toward Captain Inabinett, then fell to his knees, and then toward Captain Inabinett again.

The Court has carefully reviewed Plaintiff's Exhibit 1, the ABI Report, but cannot locate the alleged statement by Captain Inabinett that Mr. Shaw moved toward Deputy Motley with the TASER.  Captain Inabinett's statements that are included in the ABI Report are internally consistent in that Mr. Shaw approached Captain Inabinett with the TASER.  In these accounts, Captain Inabinett stated that Mr. Shaw approached him with the

feet from Mr. Shaw, took one or two steps back, drew his pistol, and shot Mr. Shaw twice in the

back. Mr. Shaw fell to the ground with his finger on the trigger of the TASER and died at the scene.

Plaintiff questions Captain Inabinett's version of events because he does not "explain[ ] how

Shaw was shot in the back, particularly at the angles described in the autopsy report." (Pl. Resp.

Br. 14.) Other than this speculation, Plaintiff does not dispute the medical testimony submitted by

Defendants. Dr. Song W. Wong, the medical examiner, conducted Mr. Shaw's autopsy. He

determined that the bullets entered Mr. Shaw's back from right to left, back to front, and at a

downward angle.[8] Dr. Wong opined that the bullet wounds were consistent with Captain Inabinett's

description of his and Mr. Shaw's location and movements when the shots were fired. He further

opined that the physical evidence is consistent with the officers' version of events, including that Mr.

Shaw's hands were cuffed in front of his body, that Mr. Shaw died with his right hand in a grasping

position, and that the scrapes and bruises on Mr. Shaw's body were not consistent with deliberate

strikes by a police officer.

The medical investigation into the cause of Mr. Shaw's death further revealed that Mr. Shaw

was under the influence of cocaine and alcohol during the incident. Dr. Andrew Robinson, a

toxicologist, opined that Mr. Shaw was in "a state of cocaine-induced agitated delirium" during the

incident, which would have caused him to experience psychotic behavior and hallucination,

demonstrate impaired judgment, exhibit irrational behavior, manifest extreme risk-taking, and be

---

TASER in his hands. That his later deposition testimony differed--in that he stated Mr. Shaw first approached
Deputy Motley with the TASER before he approached Captain Inabinett with the TASER--does not create a genuine
issue of material fact.

[8] Upon first review of the allegations, the Court was also curious as to how Mr. Shaw could have received
bullet wounds in his back if, as Captain Inabinett contended, that he was approaching Captain Inabinett. However,
after viewing the defendants' reenactment video (filed conventionally as Ex. 1 to C. Inabinett Aff.), the admissibility
of which has not been challenged by Plaintiff, the Court has a clear understanding of how the wounds occurred.

capable of an extraordinarily high level of physical resistance for a prolonged period of time. (Andrew Robinson Aff. ¶¶ 7-10.)

After the incident, both deputies were treated for injuries received from the altercation with Mr. Shaw. Deputy Inabinett had a sprained right index finger and an abrasion on his left index finger. Deputy Motley received more serious injuries. After feeling a shock and moving away from Mr. Shaw, Deputy Motley fell and landed on his right shoulder and arm. His injuries required physical therapy, and he did not return to full work activities until nearly eight months after the incident with Mr. Shaw.

The defendants also submitted expert testimony regarding the use of force. In general, the experts opined that the use of force by Deputy Inabinett and Captain Inabinett was appropriate in light of Mr. Shaw's resistance and threat of harm to the officers. Plaintiff does not offer her own expert testimony but instead challenges the relevance of some of the testimony. Construing the facts and reasonable inferences drawn from the facts in favor of the plaintiff, the Court will not consider the expert testimony with respect to the reactionary gap, the Tueller Principle, the FBI's standard for the application of deadly force, and the OODA (Observe Orient Decide Act) Cycle.

Plaintiff filed this action against Deputy Inabinett and Captain Inabinett, in their individual capacities, and against the City of Florala on August 7, 2005. Five counts were alleged in the complaint; however, the § 1983 claim against the City of Florala and the § 1983 due process claims and negligence claims against Deputy and Captain Inabinett were dismissed (Docs. # 64 and # 71). At this stage, only two counts remain. Count I alleges a § 1983 claim for excessive force against Deputy and Captain Inabinett. Count III alleges assault and battery claims against Deputy and Captain Inabinett to the extent they were acting as police officers for the City of Florala during the

arrest of Mr. Shaw.[9]   Plaintiff seeks declaratory relief, compensatory and punitive damages, attorney's fees and costs, and other relief to which she may be entitled.

## II.  JURISDICTION AND VENUE

The Court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights).   The parties do not contest personal jurisdiction or venue, and the court finds adequate allegations in support of both.

## III.  STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Id*. at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id*. at 322-23.

---

[9]  Plaintiff originally alleged that the Inabinetts were both City of Florala police officers and Covington County deputy sheriffs.  By Order (Doc. # 64) dated April 27, 2006, the Court dismissed the state law assault and battery claims against the defendants as deputy sheriffs due to state constitutional immunity.  The defendants could not establish peace office immunity at the motion to dismiss stage; thus, the state law assault and battery claims against the defendants as police officers remain.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id*. at 324.  To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986).  On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986).  After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

## IV.  DISCUSSION

### A.    *State Law Claims*

Deputy and Captain Inabinett argue various theories why they are entitled to summary judgment on the state law claims.  Plaintiff concedes that her state law claims cannot survive and "abandons her state-law claims against Walter Inabinett and Chris Inabinett."  (Pl. Resp. Br. 28.)  Therefore, for the reasons stated by the defendants, the state law assault and battery claims against the defendants are due to be denied with prejudice.

### B.    *Qualified Immunity*

Deputy and Captain Inabinett also advance several arguments for why they are entitled to summary judgment on the § 1983 claims, including qualified immunity, no more than de minimis force was used by Deputy Inabinett, the use of force by both defendants was justifiable self-defense,

and Plaintiff lacks standing to bring the claims.  After a careful review of the parties' arguments and evidentiary submissions, the Court finds that qualified immunity is the dispositive issue.  Therefore, analysis of the defendants' other arguments will only be made as necessary.

The Court now will analyze the application of qualified immunity to the allegations for the excessive use of force by Deputy Inabinett and for the deadly use of force by Captain Inabinett.

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "To be even potentially eligible for qualified immunity, the official has the burden of establishing that he was acting 'within the scope of his discretionary authority.'" *O'Rourke v. Hayes*, 378 F.3d 1201, 1205 (11th Cir. 2004) (quoting *Hartsfield v. Lemacks*, 50 F.3d 950, 953 (11th Cir. 1995)).  There is no dispute here that Deputy and Captain Inabinett were acting within the scope of their discretionary authority.

Once it is established that the defendant was acting within his discretionary authority, the burden shifts to the plaintiff to prove that qualified immunity is not warranted.  *Vinyard*, 311 F.3d at 1346.  The Supreme Court has articulated a two-part test in the qualified immunity analysis.  First, the court must determine whether the plaintiff's allegations establish a constitutional violation.  *Hope v. Pelzer*, 536 U.S. 730, 736 (2002); *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (stating that the court must evaluate the complaint to determine if, assuming the allegations are true, it pleads a cognizable violation of the constitution).  If this is answered in the affirmative, the court's next step is to determine whether the right in question was clearly established.  *Saucier*, 533 U.S. at 201.  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would

be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Id.* at 202 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999) (stating that "the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established.")).  In essence, a defendant is entitled to "fair  warning" that his alleged conduct would be unconstitutional.  *Hope*, 536 U.S. at 741.  A plaintiff can establish that the law clearly provided notice to the officers that the conduct was unconstitutional by submitting fact-specific precedents or demonstrating that the conduct "lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent." *See Vinyard*, 311 F.3d at 1355 (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002)).

### 1.   <u>Constitutional Violation</u>

The Court's first step, then, is to determine whether the facts of this case establish that Deputy Inabinett, by the use of force against Mr. Shaw during his arrest, or that Captain Inabinett, by the use of deadly force against Mr. Shaw, violated Mr. Shaw's constitutional rights.

Fourth Amendment protection against unreasonable searches and seizures includes the right to be free from the use of excessive force during an arrest.  *Graham v. Connor*, 490 U.S. 386, 395 (1989) (holding that "all claims that law enforcement officers have used excessive force-deadly or not-in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ."); *see also Tennessee v. Garner*, 471 U.S. 1 (1985); *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002).  The Court must determine whether the officers' actions are "objectively reasonable" as "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396-97 (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)); *see also Kesinger v.*

13

*Herrington*, 381 F.3d 1243, 1248 n.3 (11th Cir. 2004) ("To determine whether the amount of force used by a police officer was proper, a court must ask whether a reasonable officer would believe that this level of force is necessary in the situation at hand.").  Reasonableness is determined by a totality of the circumstances: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396 (citing *Garner*, 471 U.S. at 8-9).  The Court's determination of reasonableness must allow "for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

### 2.   Deputy Inabinett

There is no dispute that Deputy Inabinett used force during the arrest of Mr. Shaw.  For purposes of this analysis, it is Plaintiff's burden to prove that Deputy Inabinett's use of force against Mr. Shaw was objectively unreasonable under the circumstances.  *See Vinyard*, 311 F.3d at 1346. Plaintiff claims that "[a]t the time of Chris Inabinett's contact with Mr. Shaw, he was a suspected misdemeanant whose only interest was in escaping. In physically beating him, Chris Inabinett went to extraordinary and unreasonable lengths to effect an arrest."  Plaintiff makes no other argument with respect to Deputy Inabinett.

A typical arrest involves some force and injury.  *See Rodriguez v. Farrell*, 280 F.3d 1341, 1351 (11th Cir. 2002).  As such, it is clear that the use of some force in making an arrest is not only necessary but is lawful, "regardless of the severity of the alleged offense." *Durruthy v. Pastor*, 351 F.3d 1080, 1094 (11th Cir. 2003).  "The application of *de minimis* force, without more, will not

14

support a claim for excessive force in violation of the Fourth Amendment." *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000).

There is no dispute that Mr. Shaw's arrest warrant was for a misdemeanor trespass offense. Nor do the parties dispute that Mr. Shaw attempted to escape. The plaintiff, however, fails to account for the fact that by attempting to escape, by physically resisting arrest, by kicking and striking the officers, by kicking and damaging the patrol car, and by attempting to take Deputy Inabinett's weapons, Mr. Shaw created a situation whereby the seriousness of his offenses increased exponentially. Consequently, Deputy Inabinett's use of force increased proportionally. The record evidence does not establish a "physical beating" of Mr. Shaw. Plaintiff's evidence shows that witnesses saw Deputy Inabinett use some sort of choke hold to take Mr. Shaw down to the ground after Mr. Shaw resisted arrest and fled from Deputy Inabinett. This evidence further shows that during a prolonged struggle to get a resistant Mr. Shaw into the back of the patrol car, Deputy Inabinett made a kicking or pushing movement with his foot toward Mr. Shaw, who was in the back seat of the patrol car. As a whole, the deposition testimony of Plaintiff's witnesses, Linda Carson and Everett Wallace, greatly corroborates the defendants' description of events. Moreover, the medical evidence shows that, other than the gunshot wounds, Mr. Shaw's injuries were minor and not consistent with deliberate striking. The Court finds that the injuries inflicted by Deputy Inabinett were *de minimis*. *See, e.g., Nolin*, 207 F.3d at 1255 (finding *de minimis* force where an officer "grabbed [the plaintiff] from behind by the shoulder and waist, threw him against a van three or four feet away, kneed him in the back, and pushed his head into the side of the van, searched his groin area in an uncomfortable manner, and handcuffed him").

If Deputy Inabinett went to "extraordinary lengths" to effect Mr. Shaw's arrest, as Plaintiff contends, he did so as a result of Mr. Shaw's extraordinary effort to evade arrest.  The force used was necessary to effect the arrest, especially in light of the actual harm caused Deputy Inabinett and the real and immediate threat to the safety of the officers and others.  Plaintiff has not established that the use of force by Deputy Inabinett in these circumstances was objectively unreasonable.  No constitutional violation is present.  Deputy Inabinett is thus entitled to qualified immunity.

### 3. Captain Inabinett

The undisputed facts establish that Captain Inabinett used deadly force during the arrest of Mr. Shaw.  Deadly force is unconstitutional only if its use is found to be objectively unreasonable. *See Graham*, 490 U.S. at 396-97.  Plaintiff's framing of the issue is "whether it is reasonable to shoot a handcuffed, shackled prisoner in the back when that prisoner is on the ground." (Pl. Resp. Br. 24.) Were these the only facts, the Court would agree that the use of deadly force was unconstitutional. However, the Court must consider the totality of the circumstances, including those facts that Plaintiff would have the Court ignore.  And, in considering all of the facts "from the perspective of a reasonable officer on the scene," the Court finds that the deadly force used here was objectively reasonable.

Again, Plaintiff does not dispute that Mr. Shaw was actively resisting arrest and attempting to flee and that the application of some force was warranted.  Rather, Plaintiff argues that "the amount of force used was clearly disproportionate to the need."  (Pl. Resp. Br. 26.)  In effect, the parties dispute only the reasonableness of the shooting.  Plaintiff asserts that Mr. Shaw posed only a "minimal" risk to the officers because (1) Mr. Shaw's "mobility was impaired both by shackles and the fact that his trousers had been pulled down to his knees" and (2) the TASER, in its drive stun

16

mode, was "capable of inflicting pain but not incapacitating." (*Id.* 26-27.)  Plaintiff makes no other argument.

Plaintiff has not demonstrated the existence of genuine issues of material fact with respect to the force used by Captain Inabinett.  The parties dispute whether an application of a TASER, while in its drive stun mode, can actually "incapacitate" a person.  Even if the Court were to accept as true Plaintiff's proposition that the TASER only causes pain and not incapacitation, it is a moot point.  This is because there is no dispute that Mr. Shaw wielded the weapon in such a way as to inflict pain on the officers and to cause Deputy Inabinett to fall to the ground.[10]  Mr. Shaw's actions extended far beyond the point of "pos[ing] an immediate threat to the safety of the officers or others." *Graham*, 490 U.S. at 396.  Mr. Shaw caused actual harm to the officers, and the Court need not speculate, as the parties do, as to whether Mr. Shaw was either a continuing threat to the safety of the officers and others or likely to cause the officers more serious harm if given another chance.  Captain Inabinett's belief that deadly force was necessary to prevent imminent harm is reasonable given that Mr. Shaw had committed serious crimes against the deputies, was in possession of the deputy's weapon, and had already succeeded in harming them.  *See, e.g., Colston v. Barnhart*, 130 F.3d 96 (5th Cir. 1997) (holding that shooting of detainee was reasonable where he violently and forcefully resisted officers,  knocked them to the ground, and took two steps toward the patrol car); *Gaddis v. Redford Township*, 188 F. Supp. 2d 762, 770 (E.D. Mich. 2002) (holding that shooting of

---

[10]  Plaintiff asserts that a TASER is a non-lethal weapon but does not dispute that a TASER is, in fact, a weapon.  Courts have found deadly force reasonable where officers are threatened with weapons. *See McCormick v. City of Fort Lauderdale*, 333 F.3d 1234 (11th Cir. 2003) (finding deadly force reasonable where arrestee was armed with walking stick and ignored repeated commands to drop weapon); *Stevens v. Metropolitan Transp. Auth. Police Dept.*, 293 F. Supp. 2d 415 (S.D.N.Y. 2003) (military sword); *Little v. Smith*, 114 F. Supp. 2d 437 (W.D.N.C. 2000) (stick);  *Plakas v. Drinski*, 811 F. Supp. 1356 (N.D. Ind. 1993) (fireplace poker).

motorist was reasonable where the fact that motorist stabbed one officer showed that the threat posed to officers was quite high).

The parties also dispute whether Captain Inabinett had actual knowledge that Mr. Shaw was in leg irons. Although Captain Inabinett claims that he did not know Mr. Shaw was in leg irons, Plaintiff argues that Captain Inabinett would have had to have seen the leg irons when Mr. Shaw got out of the patrol car. In light of the other circumstances here, it is irrelevant whether Captain Inabinett had actual knowledge of the leg irons. Any reasonable officer would believe that deadly force was necessary where a shackled arrestee, (1) after a prolonged and violent resistance to arrest and continuous attempts to flee, (2) who is a cuffed with his hands in front of his body, (3) is seemingly unaffected by commands, strikes, chemical sprays, and TASER shocks, and (4) has somehow managed not only to take a TASER away from an officer, (5) but also to shock that officer causing him to fall to the ground, (6) nevertheless continues to come toward another officer with a TASER in his hands.[11] It bears repeating that this is a very narrow holding based on all of the facts present here.

Mr. Shaw's shooting death is a tragedy. However, it is not objectively unreasonable under the Fourth Amendment. Plaintiff fails to carry her burden of persuasion to establish that Captain Inabinett's use of deadly force was a constitutional violation. Captain Inabinett is entitled to qualified immunity.

---

[11] In this last regard, it is also irrelevant whether Mr. Shaw was coming toward Deputy Motley or Captain Inabinett. That he was approaching any person, let alone a law enforcement officer, with a weapon and the intent to use it, justified the use of deadly force against Mr. Shaw. *See Graham*, 490 U.S. at 396 (reiterating that "whether the suspect poses an immediate threat to the safety of the officers *or others*" is circumstance that must be considered in adjudging reasonableness).

## V.  CONCLUSION

Accordingly, it is ORDERED that the Defendant's Motion for Summary Judgment (Doc. # 66) is GRANTED, and all claims are DISMISSED with prejudice.  Plaintiff's First Motion in Limine (Doc. # 76) is DENIED as MOOT.

An appropriate judgment will be entered.

DONE this the 1st day of September, 2006.

_____/s/   W.  Keith Watkins_____
UNITED STATES DISTRICT JUDGE